1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT FOR THE

7                         EASTERN DISTRICT OF CALIFORNIA

8

9   AMICA MUTUAL INSURANCE          )        No. CV-F-07-1410 OWW/DLB
    COMPANY,                        )
10                                  )        MEMORANDUM DECISION GRANTING
                                    )        PLAINTIFF'S MOTION FOR
11                                  )        SUMMARY JUDGMENT (Doc. 29)
                       Plaintiff,   )
12                                  )
              vs.                   )
13                                  )
                                    )
14  KYLE MATTHEW FISCHER aka        )
    KYLE SIMMONS; MICHAEL FISCHER   )
15  aka MICHAEL SIMMONS; KELLY      )
    SIMMONS; JASON SIMMONS; JOHN    )
16  ROE, a minor by and through     )
    his guardian ad litem, SHEILA   )
17  IRENE CALLAHAN; JOHN ROE, a     )
    minor by and through his        )
18  guardian ad litem, BRENDA       )
    TEIXEIRA, and Does 1-20,        )
19                                  )
                                    )
20                     Defendants.  )
                                    )
21  _____ )

22       Plaintiff Amica Mutual Insurance Company (Amica) has filed a

23  Complaint for Declaratory Relief and Recovery of Defense Costs.

24  Defendants are Kyle Matthew Fischer aka Kyle Simmons; Michael

25  Fischer aka Michael Simmons; Kelly Simmons; Jason Simmons; John

26  Roe, a minor by and through his guardian ad litem, Sheila Irene

                                    1

Callahan; John Roe, a minor by and through his guardian ad litem, Brenda Teixeira, and Does 1-20.  The Complaint alleges "this case arises from underlying litigation filed in the United States District Court for the Eastern District of California (*John Roe, et al. v. Gustine Unified School District, et al.*, USDC Case No. 07-256) as well as underlying litigation filed in the Superior Court of the State of California, County of Madera (*Brenda Teixeira, et al. v. Gustine Unified School District, et al.*, Madera County Superior Court Case No. MCV 037071)."  The Complaint further alleges:

> 3.  This is a complaint for declaratory relief, pursuant to the Declaratory Judgment Act, in which there is an actual controversy between the parties regarding the duties to defend and indemnify, if any, owed by plaintiff Amica Insurance to insureds Kyle Matthew Fischer, aka Kyle Simmons; Michael Fischer, aka Michael Simmons; Kelly Simmons; Jason Simmons (hereinafter collectively referred to as 'the Simmons defendants') in the above-referenced lawsuits filed against the Simmons defendants by (1) John Roe, a minor by and through his guardian ad litem, Sheila Irene Callahan and (2) John Roe, a minor, by and through his guardian ad litem, Brenda Teixeira.

> 4.  Plaintiff, Amica Insurance Company, seeks a judicial determination that it owes no duty to defend or indemnify the Simmons defendants in the above-referenced lawsuits.  Plaintiff also seeks reimbursement of attorneys fees and costs expended to date in its defense under a reservation of rights.

All defendants have filed Answers to Amica's Complaint.

Amica has filed a motion for summary judgment.

John Roe through Brenda Teixeira has filed a Statement of

2

Non-Opposition to Amica's motion.   John Roe through Sheila Callahan (referred to by Amica as the "federal John Roe" or as "John Roe I") has filed an opposition.

The Simmons Defendants are represented by attorney Thomas LoSavio in the underlying Federal action, apparently as *Cumis* counsel pursuant to California Civil Code § 2860.   Mr. LoSavio has not appeared for the Simmons Defendants in Amica's declaratory relief action.   By Order filed on March 6, 2008, the Simmons Defendants were advised that Rule 83-183(a), Local Rules of Practice, provides:

> Any individual who is representing himself or herself without an attorney must appear personally or by courtesy appearance by an attorney admitted to the Bar of this Court and may not delegate that duty to any other individual, including husband or wife, or any other party on the same side appearing without an attorney.   Any individual representing himself or herself without an attorney is bound by the Federal Rules of Civil or Criminal Procedure and by these Local Rules.   All obligations placed on 'counsel' by these Local Rules apply to individuals appearing in propria persona. Failure to comply therewith may be ground for dismissal, judgment by default, or any other sanction appropriate under these Rules.

The Simmons Defendants have filed a Statement of Disputed Facts in opposition to Amica's motion but have not filed a memorandum of points and authorities in opposition.   The Simmons Defendants' Statement of Disputed Facts in opposition to Amica's motion lists all of the Simmons Defendants; however, this pleading is signed only by "Kelly Simmons For Kelly Simmons, Michael Fischer, Kyle Fischer, Jason Simmons."   The Simmons Defendants' Statement of

3

Disputed Facts reiterates the same admissions and disputes set forth in John Doe I's Statement of Disputed Facts.  Only Kelly Simmons appeared at the hearing on Amica's motion for summary judgment.  Only Kelly Simmons has responded to Amica's motion for summary judgment; Jason Simmons, Kyle Simmons and Michael Simmons have not.

A.   <u>GOVERNING STANDARDS</u>.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id.*  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id.*

The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in

4

order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *Id*.  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id*.  The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id*.  The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id*.

   B.   <u>AMICA'S STATEMENT OF UNDISPUTED FACTS</u>.

   <u>UMF 1</u>: The Simmons defendants were named as defendants in a complaint filed in the United States District Court for the Eastern District of California, by defendant, John Roe I, a minor, by and through his guardian ad litem, Sheila Irene Callahan filed on May 30, 2007 and entitled *John Roe, et al. v. Gustine Unified School District, et al.*, USDC Case No. 07-256

1  ("the underlying Federal action").[1]

2       This fact is admitted.

3       **UMF 2**: The complaint in the underlying Federal action

4  alleges causes of action against Kyle and Michael Simmons for (1)

5  sexual battery, (2) assault and battery, (3) intentional

6  infliction of emotional distress, and (4) gender violence.

7       This fact is admitted.

8       **UMF 3**: The complaint in the underlying Federal action

9  alleges causes of action against Kelly and Jason Simmons for (1)

10  vicarious liability of parent/guardian for willful acts of a

11  minor and (2) negligent supervision.

12       This fact is admitted.

13       **UMF 4**: The complaint in the underlying Federal action prays

14  for damages, including punitive damages.

15       This fact is admitted.

16       **UMF 5**: The Simmons defendants were named as defendants in a

17  complaint filed in the Superior Court of the State of California,

18  County of Madera by defendant John Roe ("John Roe II"), a minor

19  by and through his guardian ad litem, Brenda Teixeira, filed on

20  July 12, 2007 and entitled *Brenda Teixeira, et al. v. Gustine*

21  *Unified School District, et al.*, Madera County Superior Court

22  Case No. MCV 037071 ("the underlying State action").

23       This fact is admitted.

24  _____

25       [1]The underlying Federal complaint was filed under seal as No.
   CV-F-07-at-00256 *SEALED*.  That case number was closed on May 31,
26  2007 and the action converted to Case No. CV-F-07-796 OWW/DLB.

**UMF 6**: The complaint in the underlying State action alleges causes of action against Kyle and Michael Simmons for (1) childhood sexual abuse, (2) assault, (3) battery, (4) intentional infliction of emotional distress, and (5) conspiracy.

This fact is admitted.

**UMF 7**: The complaint in the underlying State action alleges causes of action against Kelly and Jason Simmons for negligent supervision.

This fact is admitted.

**UMF 8**: The complaint in the underlying State action prays for damages, including punitive damages.

This fact is admitted.

**UMF 9**: The allegations in both underlying actions arise from events occurring at a school sponsored football camp which took place on July 13, 15, 2006.

This fact is admitted.

**UMF 10**: Both complaints in the underlying actions allege the following actions by the Simmons defendants: (1) Kyle and Michael Simmons filled pillow cases with football and other heavy equipment and used the pillow cases to assault the younger players, causing physical injury; (2) Kyle and Michael Simmons slapped used condoms on the body of the younger students and threatened to repeat this action while they slept; (3) Kyle and Michael Simmons chased down freshmen for purposes of sexual penetration by insertion of a foreign object into the anus.  John Roe I was pinned down and a battery powered air mattress pump

nozzle was shoved into his anus forcing air into his rectum and
intestines.  John Roe II had such an act attempted against him;
(4) Kyle and Michael Simmons sexually harassed John Roe I and
John Roe II verbally and physically.

It is admitted that the underlying Federal and State
complaints make these allegations, but that the Simmons
defendants have filed Answers in both actions specifically
denying the allegations.

UMF 11: Amica agreed to pay for a defense of the Simmons
defendants in the underlying Federal and State actions subject to
a full and complete reservation of rights and subject to
California Civil Code § 2860.  This reservation of rights
included reserving the right to recover any sums paid with
respect to uncovered claims, including defense and/or indemnity.

This fact is admitted.

UMF 12: Amica provided homeowners insurance coverage to
named insureds Kelly and Jason Simmons in accordance with policy
number 670204-1185, for the period of February 27, 2006 to
February 27, 2007.

This fact is admitted.

UMF 13: Amica policy numbers 670204-1185 and 670704-1312
afforded homeowners property and liability insurance coverage in
accordance with coverage form HO 00 03 10 00, subject to other
provisions and endorsements of the policy.

This fact is admitted.

UMF 14: Amica policy number 670204-1185 (effective 2/27/2006

8

- 7/11/2006) provides in part as follows:

**AGREEMENT**

**We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.**

**DEFINITIONS**

**A.  In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household.  "We", "us", and "our" refer to the Company providing this insurance.**

**B.  In addition, certain words and phrases are defined as follows:**

**...**

> **2.  "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.**

**...**

> **8.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:**

>> **a.  Bodily Injury; or**

>> **b.  Property Damage.**

**...**

**SECTION II - LIABILITY COVERAGES**

**A.  COVERAGE E - Personal Liability**

**If a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, we will:**

9

> 1.  Pay up to our limit of liability for the damage for which the insured is legally liable. Damages include prejudgment interest awarded against the insured; and
>
> 2.  Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false, or fraudulent.  We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability for the occurrence has been exhausted by payment of a judgment or settlement.

...

**SECTION II - EXCLUSIONS**

**E.  Coverage E - Personal Liability and Coverage F - Medical Payments to Others**

**Coverages E and F do not apply to the following:**

> 1.  Expected or Intended Injury
>
> Bodily injury or property damage which is expected or intended by an insured, even if the resulting bodily injury or property damage:
>
> > a.  is of a different kind, quality, or degree than initially expected or intended; or
> >
> > b.  is sustained by a different person, entity, real or personal property, than initially expected or intended.
>
> However, this Exclusion E.1 does not apply to bodily injury resulting from the use of reasonable force by an insured to

10

1            protect persons or property.

2        ...

3            7.   Sexual Molestation, Corporal
             Punishment, Or Physical or Mental
4            Abuse

5            Bodily injury or property damage
             arising out of sexual molestation,
6            corporal punishment, or physical or
             mental abuse.

7
             Additionally, the "Special
8            Provisions - California" form, form
             HO 01 04 03 04 provides in part:
9
             The following exclusion is added to
10           all forms and Endorsement HO 24 73:

11               We do not provide
                 coverage for fines,
12               penalties, double or
                 treble damages, punitive,
13               exemplary, or vindictive
                 damages; or any other
14               type of added damages
                 intended to punish or
15               deter wrongful conduct
                 rather than as
16               compensation for actual
                 damages.

17
        It is admitted that the Amica policy contains these
18
    provisions.  It is denied that the Amica policy was effective
19
    2/27/2006 - 7/11/2006 because Amica has offered no evidence that
20
    the policy was cancelled on July 11, 2006 and the only evidence
21
    offered shows that the policy was effective from February 27,
22
    2006 through February 27, 2007.
23
        **UMF 15**: Amica issued an umbrella liability policy, number
24
    770204-1045 to Kelly and Jason Simmons for the period February
25
    27, 2006 to February 27, 2007.
26

                                    11

This fact is admitted.

<u>UMF 16</u>: Policy No. 770204-1045, form DL 98 01 06 98, provides in pertinent part:

> **AGREEMENT**
>
> In return for payment of the premium and subject to all the terms of the policy, we agree with you as follows:
>
> I.  Definitions
>
> ...
>
>> J.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:
>>
>>> 1.  "Bodily injury"; or
>>>
>>> 2.  "Property damage".
>>
>> K.  "Personal injury" means injury arising out of one or more of the following offenses:
>>
>>> 1.  False arrest, detention or imprisonment;
>>>
>>> 2.  Malicious prosecution;
>>>
>>> 3.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>>
>> ...

12

N.   "Retained limit" means:

1.  The total limits of any "underlying insurance" or any other insurance that applies to an "occurrence" or offense which:

a.  Are available to an "insured"; or

b.  Would have been available except for the bankruptcy or insolvency of an insurer providing "underlying insurance"; or

2.  The deductible, in any, as stated in the Declarations, if the "occurrence" or offense:

a.  Is covered by this policy; and

b.  Is not covered by any "underlying insurance" or any other insurance.

O.  "Underlying insurance" means any policy providing the "insured" with primary liability insurance covering one or more of the types of liability listed in the Declarations and at limits no less than the retained policy limits shown for these types of liability listed in the Declarations.

II.  Coverages

13

**A.  Insuring Agreement**

**We will pay damages in excess of the "retained limit", for:**

> **1.  "Bodily injury" or "property damage" for which an "insured" becomes legally liable due to an "occurrence" to which this insurance applies; and**

> **2.  "Personal injury" for which an "insured" becomes legally liable due to one or more offenses listed under the definition of "personal injury" to which this insurance applies.**

> **Damages include prejudgment interest awarded against the insured.**

**III.  Exclusions**

**A.  The coverages provided by this policy do not apply to:**

> **1.  "Bodily injury" or "property damage" arising out of an act which is expected or intended by an "insured" to cause "bodily injury" or "property damage".  This Exclusion (A.1) applies even if the "bodily injury" or "property damage":**

> > **a.  Is of a different kind, quality or degree than expected or intended; or**

14

              **b.   Is sustained by a different person or entity than expected or intended.**

      **2.   "Personal injury":**

      **...**

              **c.   Arising out of a criminal act committed by or at the direction of one or more "insureds"; or**

      **...**

      **13.   "Bodily injury" or "personal injury" arising out of:**

      **...**

              **b.   Sexual molestation, corporal punishment or physical or mental abuse;**

**This fact is admitted.**

**UMF 17: The complaint in the underlying Federal action contains the following material allegations against the Simmons defendants:**

      **From July 13, 2006 through July 15, 2006, Plaintiff [John Roe I] and other Gustine High School freshman student athletes were subjected to constant and pervasive sexual abuse, sexual harassment, sexual assault, sexual battery, degradation, humiliation, intimidation, assault, battery, and false imprisonment, by older male student athletes**

15

enrolled as students at Gustine High School
and Liberty High School when the sexual abuse
and hazing were committed.  Specifically,
Plaintiff [John Roe I] and other Gustine High
School freshman student athletes were
subjected to the following improper conduct:

     (a) The student athletes attending
the football camp engaged in a "pillow fight"
among upper and lower classmen.  During the
"pillow fight" pillow cases were filled with
football equipment and other heavy objects.
The upper classmen, including Kyle Fischer,
Michael Fischer, McKimmie, and San Felipo,
then used the filled pillow cases to assault
the younger players.  Plaintiff [John Roe I]
was struck in the head with one of the filled
pillows and suffered a severe head injury as
a result.

     (b) The upper classmen attending
the football camp, including Kyle Fischer,
Michael Fischer, McKimmie, and San Felipo,
slapped a used condom, containing substance
that appeared to be semen, onto the body of
the lower classmen and threatened to repeat
this act on Plaintiff and other freshman's
face, mouth or head while they slept.  The
led Plaintiff [John Roe I] and others to
sleep in shifts to protect the others.

     (c) Upper class student athletes,
including Kyle Fischer, Michael Fischer,
McKimmie, and San Felipo, roamed in groups
freely and unsupervised around campus chasing
down freshmen for the purpose of forcing a
sexual penetration by the insertion of a
foreign object into their anus.  Plaintiff
[John Roe I] was sexually assaulted and
anally penetrated by this dangerous and
despicable act.  After being chased and
caught by a group of upper class student
athletes from Gustine High School and Liberty
High School, including Kyle Fischer, Michael
Fischer, McKimmie, and San Felipo,
Plaintiff's [John Roe I] arms and legs were
forcibly restrained by at least four members
of he group.  Despite Plaintiff's [John Roe
I] physical struggle and verbal protest, he
was forced against his will to be turned
upside down on to his head, his arms were

16

forced away from his backside as he attempted
to block entry into his anus, his pants and
underwear were stripped off exposing his
buttocks and genitals, his legs were held up
and vertical, his legs and butt cheeks were
spread apart, and a battery powered air
mattress pump nozzle was shoved into his anus
forcing air into his rectum and large
intestines.

(d) After the above described
attack, Plaintiff [John Roe I] experienced
pervasive, severe and unwelcome harassment
based on gender and sexual orientation.
Plaintiff's [John Roe I] older team member
from Gustine High School harassed him
physically and verbally and continuously
subjected Plaintiff [John Roe I] to
homosexual epithets, establishing a
collective belief among the student athletes
from Gustine High School and Liberty High
School that Plaintiff [John Roe I] was a gay
student athlete.

(e) The upper classmen perpetrating
the acts described above upon the Plaintiff
[John Roe I] and others were: Kyle Fischer,
Michael Fischer, McKimmie, San Felipo, and
possibly others to be identified.

It is admitted that the underlying Federal complaint

contains these allegations, but it is asserted that the Simmons

defendants have specifically denied that these acts occurred.

**UMF 18**: The complaint in the underlying Federal action

contains the following material allegations against the Simmons

defendants:

32.  Plaintiff [John Roe I] alleges upon
information and belief that all Defendants,
unless otherwise specified, all acts or
omissions alleged in this complaint were
committed knowingly, intentionally, and/or
with conscious disregard of or deliberate
indifference toward, the well-being of
Plaintiff.

17

It is admitted that the underlying Federal complaint contains these allegations, but it is asserted that the Simmons defendants have specifically denied that these acts occurred.

**UMF 19, 20, 21:**

The complaint in the underlying Federal action contains the following allegations:

> 59.  In performing the unlawful act of anal penetration alleged herein, Defendants intended to, and did, cause harmful and offensive sexual contact with the person of Plaintiff, JOHN ROE [I], and did so with knowledge that the consequences flowing from such acts were substantially certain to occur.  As a proximate result, Plaintiff suffered harmful and offensive sexual contact with Defendants.  Defendants' acts were not privileged, were done without Plaintiff's consent and constitute sexual battery within the meaning of Civil Code section 1708.5.
>
> ...
>
> 61.  Defendants' despicable acts as alleged herein were performed with malice, fraud and oppression, and with willful and conscious disregard of Plaintiff's rights and safety, and merit an award of punitive and exemplary damages to punish said Defendants and to set an example for those similarly situated.
>
> ...
>
> 64.  In performing the unlawful acts of hitting Plaintiff with a pillow case filled with football equipment, forcibly restraining him against his will and of anal penetration alleged herein, Defendants intended to, and did, cause harmful and offensive contact with the person of plaintiff, JOHN ROE [I], and did so with the knowledge that the consequences flowing from such acts were substantially certain to occur.  As a proximate result, Plaintiff suffered harmful and offensive contact with Defendants.  Defendants' acts were not privilege, and were

18

1   done without plaintiff's consent.

2       It is admitted that the underlying Federal complaint

3   contains these allegations, but it is asserted that the Simmons

4   defendants have specifically denied that these acts occurred.

5       UMF 22, 23: The complaint in the underlying State action

6   alleges:

7           15.  On or about July 13, 2006, while
            attending the football camp at Liberty High
8           School, in Madera County, California,
            defendants KYLE FISCHER [and] MICHAEL FISCHER
9           ... who were upper classmen attending the
            football camp roamed in groups freely and
10          unsupervised while chasing down younger and
            smaller athletes at the camp for the purpose
11          of sexually penetrating these younger
            athletes with a foreign object.  After being
12          caught and forcibly restrained by defendants,
            including the above-named defendants, and
13          despite plaintiff's [John Roe II] physical
            struggle and verbal protest, he was forced
14          down on the floor, his pants and underwear
            were pulled down and defendants attempted to
15          force a battery powered air mattress pump
            nozzle in between his buttocks and into his
16          anus.  On that day, plaintiff was a minor and
            14 years of age.

17
            ...
18
            18.  On or about July 13, 2006 while
19          attending the football camp at Liberty High
            School, in Madera County, California,
20          defendants KYLE FISCHER [and] MICHAEL FISCHER
            ... who were upper classmen attending the
21          football camp, approached plaintiff [John Roe
            II] in a physically threatening and menacing
22          manner and threatened to restrain him
            physically in order to force a battery
23          powered air mattress pump nozzle in between
            his buttocks and into his anus.

24
25       It is admitted that the underlying State complaint contains

26   these allegations, but it is asserted that the Simmons defendants

1  have specifically denied that these acts occurred.

2      C.   <u>JOHN ROE I'S STATEMENT OF ADDITIONAL DISPUTED FACTS</u>.

3      <u>DMF 24</u>: Kelly and Jason Simmons deny that they had custody

4  and control of Kyle Simmons and Michael Simmons at the times of

5  the conduct alleged in the underlying complaints.

6      <u>DMF 25</u>: The underlying Federal complaint contains

7  allegations in Paragraphs 4 and 24 which amount to false

8  imprisonment.

9      <u>DMF 26</u>: Both the homeowner and umbrella policies issued by

10 Amica to Jason and Kelly Simmons which were effective February

11 27, 2006 to February 27, 2007, provide coverage for false

12 imprisonment by an insured.

13     D.   <u>Duty to Defend</u>.

14     A liability insurer has a broad duty to defend the insured

15 against claims that create a potential for indemnity.  *Montrose*

16 *Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 295 (1993).  This

17 means that "the carrier must defend a suit which *potentially*

18 seeks damages within the coverage of the policy."  *Id.* (quoting

19 *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993).

20 Hence, the duty to defend is broader than the duty to indemnify,

21 sometimes requiring that an insurer defend the insured even in an

22 action in which no damages are awarded.  *Montrose Chem. Corp.*,

23 *id.*

24     The first step to determine whether the insurer has a duty

25 to defend is to compare the allegations of the complaint with the

26 terms of the policy.  *Id.*  Facts outside the complaint may also

20

be relevant where they reveal that a possibility exists that the claim may be covered by the policy.  *Id.*  These facts outside the complaint can trigger a duty to defend "even though the face of the complaint does not reflect a potential for liability under the policy."  *Id.* at 296 (citing *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 276 (1966).  This is because, in light of pleading rules allowing liberal amendment, the third party plaintiff should not be the arbiter of coverage.  *Id.*  "The scope of the duty [to defend] does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the alleged facts or known extrinsic facts reveal a possibility that the claim may be covered by the policy."  *Cunningham v. Universal Underwriters*, 98 Cal.App.4th 1141, 11248 (2002).  The insured is entitled to a defense if facts in the complaint and in other materials tendered to the insurer indicate that "the complaint might be amended to give rise to a liability that would be covered under the policy."  *Montrose*, 6 Cal.4th at 299.

     California courts resolve in the insured's favor any doubts as to whether the facts establish the insurer's duty to defend.  *Id.* at 299-300.  "[T]he insurer need not defend if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage."  Id.* at 300.  This means that, to prevail, "the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*."  *Id.*  Facts that merely tend to show that

the claim is not covered, or is unlikely to be covered, do not eliminate the possibility that the action will fall within a policy's coverage and "therefore add no weight to the scales." *Id.* On the other hand, the duty to defend "may exist even where coverage is in doubt and ultimately does not develop.". *Id.* at 295.

To prevail in demonstrating that it does not have a duty to defend, Amica must present "evidence that the underlying claim cannot come within the policy coverage by virtue of the scope of the insuring clause or the breadth of an exclusion." *Id.* at 301. The duty to defend also extends to claims that are not covered, so long as any claim discloses the potential for liability. *Rosen v. Nations Title Ins. Co.*, 56 Cal.App.4th 1489, 1496-1497 (1997).

E.   <u>MERITS OF MOTION</u>.[2]

John Roe I argues that summary judgment must be denied because the Simmons defendants' Answers to the underlying complaints deny that the alleged acts took place, thereby created a triable issue of fact, precluding summary judgment for Amica in this declaratory relief action.

John Roe I also points to Jason and Kelly Simmons' specific denials in their Answers to the underlying complaints that they

---

[2]In opposing Amica's motion, John Roe I argues that the cancellation of the Simmons' policy is irrelevant because Amica presents no evidence to support the finding that the policies had lapsed. Amica replies that it is not relying on the cancellation of the policy as a ground for summary judgment.

had custody or control over Kyle and Michael Simmons at the time
of the conduct alleged.   John Roe I argues:

> If that is true, then Kyle and Michael
> Simmons would not be deemed 'insureds' under
> the Amica policy.  If they were not insureds
> under the Amica policy, then whether their
> conduct was intentional, expected or
> criminal, is irrelevant to coverage review.
> Jason and Kelly Simmons, on the other hand,
> would be covered for their own negligence
> irrespective of Kyle and Michael's conduct.
>
> Whether Jason and Kelly Simmons had custody
> and control over Kyle and Michael Simmons is
> imperative to not only liability issues in
> the underlying action, but also to coverage
> issues in this declaratory relief action.
> The Simmons Defendants' Answers in the
> underlying action puts the issue directly in
> dispute and create a triable issue ... for
> purposes of this motion for summary judgment.

Amica's homeowners' policy issued to Jason and Kelly Simmons
defines "insured" as:

> a.  You and residents of your household who
> are:
>
>    (1) Your relatives, or
>
>    (2) Other persons under the age of
>    21 and in the care of any person
>    named above;
>
> b.  A student enrolled in school full time,
> as defined by the school, who was a resident
> of your household before moving out to attend
> school, provided the student is under the age
> of:
>
>    (1) 24 and your relative; or
>
>    (2) 21 and in your care of the care
>    of a person described in a.(1)
>    above ....

The Scheduling Conference Order filed in the underlying Federal

Action (Doc. 65) states: "Jason Simmons contends that he is not the biological father of either Kyle Matthew Fisher [sic], aka Kyle Simmons, or Michael Fisher [sic], aka Michael Simmons." The record does not indicate whether Kyle and Michael's biological father is dead or divorced from Kelly Simmons.  If divorced, *Safeco Ins. Co. of America v. Parks*, 122 Cal.App.4th 779, 791-792 (2004), explains:

> Determining, for insurance purposes, the residence of a child whose parents are divorced is not always a straightforward matter.  Such a child may have more than one residence at the same time ... The term 'residence' connotes '"any factual place of abode of some permanency, more than a mere temporary sojourn ...'" ... Thus, a child who spends substantially equal amounts of time with each parent on a regularly rotating basis can be said to reside with each parent ... 'This understanding is consistent with dictionary definitions of the term 'resident' as one "'who dwells in a place for a period of some duration'" and "residence" as "'a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit.'" ... By the same token, a child who visits one parent only infrequently and does not maintain a room or personal belongings at that parent's home may not be a resident of that parent's home, especially where no permanent visitation schedule is in place.
>
> ...
>
> ... The term 'household' may be somewhat antiquated ... but our Supreme Court held in *Island v. Fireman's Fund Indemnity Co.* (1947) 30 Cal.2d 541 ..., that the term is generally synonymous with 'family' and embraces '"a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a 'collective body of persons living

together within one curtilage, subsisting in
common and directing their attention to a
common object, the promotion of their mutual
interests and social happiness.'"' ... [A]
household includes family members and others
who live together in the same place and who
recognize 'a common source of authority or
leadership to which the other members of the
household are subject.  Thus, a "head" may be
a father, a mother, both parents acting
together, or some other person whom the
members of the household recognize as their
"head."' ....

It is difficult to address this issue as a result of the of the

Simmons defendants' failure to file any memorandum of points and

authorities in response to this motion for summary judgment and

by Jason Simmons' failure to respond at all to the motion for

summary judgment, despite being given the opportunity to do so.

It is one thing for John Roe I's counsel to make these arguments,

but it is unfair to Amica and the Court when the only parties who

can address this issue and raise triable issues of fact whether

Kyle and/or Michael are "insureds" within the meaning of the

policy have not responded to the merits of the claim.

John Roe I does not explain how, if Kyle and/or Michael are

not "insureds" under the policy, Jason and Kelly Simmons can be

responsible under the policy for their acts.

California decisions find no coverage where the act causing

injury falls within an exclusion, even though the party seeking

coverage did not participate in the act and is sought to be held

liable only vicariously or for negligent supervision.  *See Fire*

*Ins. Exchange v. Altieri*, 235 Cal.App.3d 1352, 1361 (1991)

("[W]here, as here, the policy excludes coverage for bodily

injury intended or expected by 'an' or 'any' insured, the cases have uniformly denied coverage for all claims, including negligent supervision claims"); *Western Mutual Ins. Co. v. Yamamoto*, 29 Cal.App.4th 1474, 1486 (1994).  The conduct alleged against the juvenile defendants is all intentional and under no conceivable interpretation of the evidence could be accidental or negligent.  The alleged conduct also fits the definitions of sexual molestation and physical abuse, and bodily injury.

John Roe I argues that the allegations of the underlying Federal complaint of false imprisonment provide a basis for coverage under Amica's policy(s).  John Roe I asserts that it is expected that Kyle and Michael Simmons will testify in the underlying Federal action that they did not intend to harm, assault, batter, sexually assault, or molest John Roe I but they will admit to engaging in hazing activities, including general horseplay and holding down the underclassmen.  John Roe I argues that if that is the substance of their anticipated testimony, such conduct falls within the policy coverage for false imprisonment.  John Roe I argues that, even without the testimony of Kyle and Michael Simmons, the underlying Federal complaint alleges sufficient facts to support a cause of action for false imprisonment.

California's tort of false imprisonment consists of the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short."  *Scofield v. Critical Air Medicine, Inc.*, 45 Cal.App.4th

990, 920 (1996).

John Roe I argues the allegations of Paragraphs 4 and 24(c) contain sufficient facts to constitute a claim for "false imprisonment and negligence" by Kyle and Michael Simmons.  The fact that those causes of action were not specifically enumerated as separate causes of action is not relevant.  John Roe I notes that there is no specific exclusion in the Amica homeowner policy for false imprisonment and further notes that the Amica umbrella policy expressly provides coverage for false imprisonment.

Amica replies that the homeowners policy does not provide coverage for a claim of false imprisonment because that policy provides coverage for bodily injury "caused by an occurrence" and "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and excludes bodily injury "which is expected or intended by an insured".  With regard to the umbrella policy, Amica argues, although the definition of "personal injury" includes injury arising out of "false ... imprisonment", the umbrella policy excludes "bodily injury' ... arising out of an act which is expected or intended by an 'insured' to cause 'bodily injury' ...."

Amica cites *Ulrich v. State Farm Fire & Cas. Co.*, 109 Cal.App.4th 598 (2003).  In *Ulrich,* an individual who had settled with a licensed psychologist in a lawsuit arising from the psychologist's vendetta against the individual, brought an action against the psychologist's liability insurer, alleging that the

insurer wrongfully refused to provide the psychologist a defense.
The trial court granted summary judgment for the insurer and the
Court of Appeal affirmed, holding in pertinent part:

> Ulrich points out that the policy partly
> defined 'personal injury' as 'assault,'
> 'wrongful detention' and 'defamation' and
> argues these torts are intentional: To say
> assault is not covered because it is not
> caused by an accident would, in her view,
> demonstrate illusory coverage ....

> But the torts Ulrich mentions can be
> committed via negligent conduct.  A claim of
> assault may give rise to a duty to defend,
> because a jury could conclude the insured
> unreasonably responded to a perceived threat
> ... A wrongful detention could be found if a
> store detained a customer without reasonable
> cause ....

> These examples illustrate the point that
> claims do not exist in the ether, they
> consist of pleaded allegations coupled with
> extrinsic facts.  That is what defines the
> insurer's coverage duties, not the label
> chosen by the pleader ... Facts extrinsic to
> the complaint can defeat as well as invoke
> coverage ... Ulrich cannot invoke coverage
> simply by pleading 'negligence' in the
> complaint, nor by assuming *all* assaults,
> defamations and so forth must be covered,
> simply because those labels are included in
> the policy definition of personal injury.
> State Farm was entitled to consider extrinsic
> facts at its disposal to determine whether
> there was a possibility of coverage *due to an
> accident* ... [T]he evidence showed the
> opposite.  Not only did State Farm have
> evidence showing Lindseth's conduct was
> intentional, it also had evidence showing he
> intended to inflict harm.  No covered
> accident occurred.

109 Cal.App.4th at 610-611.

    Although, Amica concedes, the alleged false imprisonment
might be committed negligently, the allegations by John Roe I  do

28

not permit an inference that the acts were performed negligently, given the allegations that John Roe I was "chased down", "forcibly restrained ... despite physical struggle and verbal protest" and "forced against his will to be turned upside down."

John Roe I, who is the master of pleading his underlying Federal complaint, now contends, contrary to his complaint's allegations, that Kyle and Michael Simmons' alleged actions could have been negligent, i.e., unintended.  The Simmons defendants make no such assertion.  John Roe I asserts that "the underlying complaints could easily be amended to specifically enumerate separate and distinct causes of action for false imprisonment", which amendment would have to be addressed in the underlying actions.  John Roe I states that if amendment is necessary, the Court should deny this motion for summary judgment or stay it until the amendment is accomplished.

There is no doubt that the present allegations of the underlying complaints compel the conclusion that Amica has no duty to defend.  Amica cites *Northland Insurance Company v. Briones*, 81 Cal.App.4th 796 (2000).  In *Briones*, the insurance company brought a declaratory relief action to obtain a judicial interpretation of its rights under a mobilehomeowners policy it had issued to Briones.  The underlying complaint alleged causes of action that Briones had intentionally assaulted and raped Plaintiff Connie L. on numerous occasions; that the State of California was negligent in failing to provide an environment in which Connie L. would be free from sexual assault and in failing

to protect her from assault by Briones; that Briones raped, assaulted, stalked and harassed Connie L., that the State of California was negligent in hiring; that Briones negligently inflicted emotional distress by spending an inordinate amount of time with Connie L., causing their relationship to become more intense than that of teacher-student, by interfering with the familial and parental relationship, and by spending time and negligently engaging in sexual relations with Connie L, by touching Connie L.'s breast while negligently teaching her to perform a breast self-examination, and by being flirtatious with her, hugging and touching her in front of other students, and inundating her with communications in an effort to discuss their relationship.  81 Cal.App.4th at 804-805.  The Court of Appeal held that the trial court did not err in granting the insurer's motion for summary judgment in the declaratory relief action that there was no coverage under the policy, rejecting Briones' argument that there was a possibility of coverage for negligent acts which caused injury because some of the acts alleged were alleged as negligent acts.

In *J.C. Penny Casualty Ins. Co. v. M.K.,* 52 Cal.3d 1009 (1991), the California Supreme Court held: "[A]s a matter of law section 533 excludes liability insurance coverage for an insured's sexual molestation of a child.  An insured therefore cannot show or attempt to show that he subjectively intended no harm."  52 Cal.3d at 1028.  In *Horace Mann Ins. Co. v. Barbara B., supra*, 4 Cal.4th 1076, the Supreme Court held: "Our decision

is no license to 'plead around' *J.C. Penny* ... We do not sanction relabelling child molestation as negligence in order to secure insurance coverage for the plaintiff's injuries.  We merely hold to the established rule that a potential for coverage, whether found within the four corners of the complaint or in facts extrinsic to it, gives rise to the defense duty."  4 Cal.4th at 1086.  Relying on these cases, the Court of Appeal in *Briones* held:

> It is therefore clear that, while an insurer is not liable for intentional conduct, it may be liable for negligent conduct.  It is also clear that child sexual molestation is always intentional conduct ... Since almost all of the conduct alleged in the complaint is intentional child sexual molestation, there is little potential for coverage.  However, to prevail, the insurer must show that there is *no* potential for coverage ... The issue thus becomes whether the other conduct alleged in the complaint establishes a potential for coverage ....

> Some of the allegations of the complaint are transparent attempts to 'plead around' *J.C. Penny*.  There is simply no such thing as 'negligent stalking,' 'negligent harassment,' or 'unintentional child molestation.'  The few remaining allegations of negligence fall within the general category of child molestation.  These include allegations that Mr. Briones (1) 'negligently caused their relationship to become far more intense than that of teacher-student ...'; (2) 'negligently interfered with the familial relationship' and 'negligently interfered with the rights of [the parents] to the care, custody, and companionship of their daughter by spending time with and negligently engaging in sexual intercourse with Plaintiff Connie [L.] ...'; (3) negligently touched private areas while giving karate lessons; (4) negligently performed a breast examination; (5) showed affection and being

31

flirtatious in front of her fellow students; and (6) inundated her with letters 'in an effort to discuss their relationship and the status thereof.'  Thus, all of these activities, even if they are considered not to be intentional conduct, are still sexual misconduct, i.e., they were all directed towards the goal of sexual intimacy.

'California law and applicable precedents do not allow the recharacterization of such clearly intentional and willful sexual misconduct as merely negligent or nonwillful, so as to trigger insurance coverage ... [I]t is clear that [Insurance Code] section 533, and the public policy it represents, bar the attempt to shift liability for intentional sexual harassment and associated employment-related torts (claims of wrongful discharge, infliction of emotional distress, battery, and sexual assault) to an insurer ...' (*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1603 ....)

Under the policy in *Horace Mann*, there was a possibility of liability for other misconduct not amounting to sexual molestation.  Under the policy here, there was no such possibility because the policy terms were significantly different: the policy here insured only against an 'accident or occurrence' and specifically excluded coverage for injuries arising from sexual molestation and harassment.  Since all of the conduct alleged in the complaint falls within the general category of sexual misconduct, he insurance company had no duty to either indemnify or defend the teacher from the effects of his willful, intentional misconduct (Ins. Code § 533) or his negligent or reckless conduct because '[t]his exclusion applies whether damages arise from an insured's act or failure to act.'

We therefore conclude that the trial court properly focused on the allegations of the complaint and that those allegations were all allegations of sexual misconduct that were specifically excluded from the coverage of the homeowners policy.  It correctly determined that Northland had established

32

> that there was no potential for coverage, and
> thus there was no duty to defend.

*See also Fire Ins. Exchange v. Altieri*, *supra*, 235 Cal.App.3d at 1359-1360:

> This issue we decide here is whether
> Altieri's actions in assaulting Story were
> inherently harmful.  Whether he subjectively
> intended not to 'hurt Greg bad' is not
> relevant.  His 'specific intent' versus his
> 'general intent' is likewise not relevant.
> Altieri's motive is relevant *only* to the
> issue of whether his conduct was wrongful in
> the first instance.  In this case, it is
> undisputed that Altieri did not act in self-
> defense.  Story was leaning over picking up
> his books when the assault occurred.  He had
> no idea that Altieri was returning to hit
> him.  It was Altieri who urged Brent
> Christiansen to turn back the car; he stated
> he wanted to 'kick [Story's] ass'; he entered
> into a bet as to who could hit Story first;
> he assaulted Story from behind by pulling him
> by the hair and punching him.  He may not
> have intended to hurt Greg 'bad' but he did
> intend, without *any* legal justification, to
> hit him.  Altieri's conduct was inherently
> harmful and wrongful.  He assault upon Story,
> without any legal justification, is an
> uninsurable willful act under section 533.

John Roe I argues that, if the Court is inclined to grant Amica's motion, the action should be stayed to allow John Roe I to take the depositions of the Simmons Defendants:

> Kyle and Michael Simmons could provide
> testimony regarding what they claim
> transpired at the football camp.  Jason and
> Kelly Simmons could provide testimony
> regarding their custody and control of Kyle
> and Michael Simmons, and testimony regarding
> their own independent negligence.

This is a disguised Rule 56(f) request.  John Roe I does not explain that any of the Simmons Defendants actually have any such

information nor why he has failed to conduct discovery in the time this lawsuit has been on file.   The conduct alleged by John Roe I in the underlying federal complaint cannot be construed as accidental or negligent under the cases cited.

**CONCLUSION**

For the reasons stated:

1.   Amica's motion for summary judgment is GRANTED with regard to Defendant John Roe, a minor by and through his guardian ad litem, Brenda Teixeira.

2.   Amica's motion for summary judgment is GRANTED with regard to Defendant John Roe, a minor by and through his guardian ad litem, Sheila Irene Callahan, and with regard to Defendants Kyle Matthew Fischer aka Kyle Simmons, Michael Fischer aka Michael Simmons, Kelly Simmons and Jason Simmons, as there is no basis for liability insurance coverage from Amica for the conduct of Kyle Simmons or Michael Simmons under the two policies of insurance in dispute.

3.   Counsel for Amica shall prepare and lodge a form of order setting forth the rulings in this Memorandum Decision and directing entry of judgment for Amica within five (5) days following the date of service of this decision.

IT IS SO ORDERED.

Dated:   **May 5, 2008**                          **/s/ Oliver W. Wanger**
                                                     UNITED STATES DISTRICT JUDGE